[NOT FOR PUBLICATION]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LYDIA SIERRA ONGAY,

             Plaintiff,

    v.

MICHAEL ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.

Civil No. 09-0610 RMB

**OPINION**

Appearances:

    Gary Linarducci, Esq.
    Linarducci & Butler
    910 W. basin Road, Suite 100
    New Castle, DE 19720
        Attorney for Plaintiff

    David C. Weiss
    United States Attorney
    Patricia Stewart
    Special Assistant United States Attorney
    District of Delaware
    Office of General Counsel
    Social Security Administration
    P.O. Box 41777
    Philadelphia, PA 19101
        Attorneys for Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:[1]

## I.   Introduction

Lydia S. Ongay ("Plaintiff") brings this appeal seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("the Act").  See 42 U.S.C. § 1381 et seq.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth, the Court vacates the decision below and remands the case to the administrative law judge ("ALJ") for further proceedings.

## II.      Background

   A.   Procedural History

Plaintiff applied for Supplemental Security Income ("SSI") in August 1995.  (R. 141-45.)  ALJ Linda M. Bernstein found that Plaintiff suffered severe impairment relating to her hip, causing her to suffer disability as defined by the Act.  (R. 467-69.) Plaintiff was awarded SSI benefits, which were later terminated when her husband's income disqualified Plaintiff from receiving benefits. (R. 19.)  See 20 C.F.R. § 416.1160 (explaining income and its impact on SSI eligibility).

---

[1] The Honorable Renée Marie Bumb, United States District Judge for the District of New Jersey, sits in the District of Delaware by designation.

On June 23, 2005, Plaintiff filed a new application for benefits, claiming disability as of the date of her application.[2] (R. 543-57.)  Her request for benefits was denied initially and upon reconsideration.  (R. 490-501.)  Two hearings were held before ALJ Judith A. Showalter. (R. 1339-437.)  On July 25, 2008, the ALJ issued a decision denying Plaintiff's claim.  (R. 19-36.)  The Appeals Council denied Plaintiff's request for review on July 19, 2009.  (R. 10-15.)  On August 17, 2009, Plaintiff filed the above-captioned action in this Court.  (See Dkt. Ent. 2.)

B.    The ALJ's Decision

The ALJ determined that Plaintiff was not under a disability as of the date insured and was therefore not entitled to benefits. (R. at 36.)  At step one of her analysis, she concluded that Plaintiff had not engaged in substantial gainful activity as of the alleged disability onset date, June 23, 2005.  (R. at 21.)  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:  status-post right hip replacement, right knee pain, residuals of cervical, thoracic, and lumbar sprain and sprain [sic], and depression.  (Id.)  The ALJ concluded, however, that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

[2] Plaintiff originally alleged a disability onset date of August 1, 1995.  (R. at 548.)  At the hearing, the date was amended to June 23, 2005.  (R. at 1349.)

Appendix 1.  (R. at 23.)  Moving to step four, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform limited, sedentary work. (R. at 28-29.)  The ALJ found that Plaintiff was not able to resume her past relevant work but could perform jobs that existed in the national economy.  (R. at 34.)

C.  Evidence in the Record

At the time of her hearing, Plaintiff was forty-three years old[3], had separated from her husband and was living alone.  (R. at 1345.) She completed schooling through the ninth grade and had previously worked as a school bus driver.  (R. at 1351-52.)

1.  Medical History

a.  1997 Disability Determination

Plaintiff has a long history of medical problems.  As noted, she was previously found to be disabled under the Act.  (R. at 469.) In her July 11, 1997 decision awarding disability benefits, ALJ Bernstein found:

> The medical evidence establishes that the claimant has severe arthritis of a major weight bearing joint with a history of persistent joint pain and stiffness, marked limitation of motion in the affected joint, gross anatomical deformity in the right hip and markedly limited ability for prolonged sitting, walking or standing.

---

[3]  Because Plaintiff was forty-three, she was characterized as a "younger person" by the regulations.  See 20 C.F.R. § 416.963 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").

4

(R. at 468.)   Plaintiff underwent total right hip replacement in 1996.  (R. at 440-41.)   ALJ Bernstein found that post-surgery, Plaintiff "developed severe intractable back pain," accepted Plaintiff's account of "pain in her lumbar spine, buttock, thigh and calf," and concluded that "the testimony and medical evidence establish[ed] that the claimant's impairments would be of sufficient severity to meet listing 1.03A in Appendix 1, Subpart P of Regulations No. 4."  (R. at 468.)

        b.   Orthopedic Issues

    Plaintiff was followed by Leo Raisis, M.D. of First State Orthopedics for post-operative care relating to her hip replacement. (R. at 842-88.)   At an October 2000 visit, during which she complained of right hip pain, Plaintiff was found to have possible loosening of the hip.  (R. at 878.)   One month prior she had been involved in a motor vehicle accident.  (R. at 876.)   Between October and December 2001, Plaintiff underwent diagnostic testing relating to her hip and back pain, including a bone scan of the pelvis and hip, magnetic resonance imaging ("MRI"), lumbar myelogram and computed tomography ("CT") scan. The testing demonstrated concern for "post surgical changes or some degree of stress phenomenon" and disc bulges. (Id.) Plaintiff underwent surgery in December 2002 to revise her artificial hip.  (R. at 767.)   She continued to report pain to her orthopedist post-revision.  (R. at 861-64.)

At a February 4, 2005 orthopedic exam, Plaintiff described "severe right hip and posterior buttock pain" that she felt was related "to using her leg on the air breaks" of the school bus she drove part-time. (R. at 861.) Dr. Raisis concluded that she should not return to work as a bus driver; rather, she should return only to a sedentary occupation. (Id.; R. at 843.) Plaintiff left her bus driver position and filed an SSI application the following June. (R. at 543-47.)

A January 2006 imaging study of Plaintiff's thoracic and lumbar spine revealed slight scoliosis, slight disc narrowing at the T11-T12 level, signs of early degenerative disc disease and narrowing at the L5-S1 level. (R. at 957.) On February 9, 2006, Plaintiff sought treatment at Christiana Hospital due to injury from a second motor vehicle accident. (R. at 1086-96.) Plaintiff was evaluated by pain specialist Damon Cary, D.O. the following month. (R. at 1182-83.) Dr. Cary diagnosed Plaintiff as having "cervical spine strain and sprain with radicular symptoms," "thoracic spine strain and sprain" and "lumbar spine strain and strain superimposed upon a pervious lumbar injury." (R. at 1183.) A May 15, 2006 MRI suggested a "small right posterior annular tear at L5-S1 with no accompanying disc herniation" and "mild degenerative changes." (R. at 1144-45.) An electromyography report completed the following day indicated "right L4-5 radiculopathy" with "no evidence of peripheral

6

polyneuropathy or myopathy." (R. at 1178.)

On July 19, 2006, Plaintiff's right leg gave out. (R. at 1174.) An MRI of her right knee showed an "anterior cruciate ligament rupture, bone contusion, mild strain and possible tear of the medial meniscus." (R. at 1085.) Upon examination, Conrad King, Jr., M.D., an associate of Dr. Cary's, opined that the knee injury was "a direct result of the patient's right leg giving way due to her right lumbar radiculopathy." (Id.)

Dr. Raisis performed a right knee arthroscopy and partial lateral meniscectomy on Plaintiff, which revealed a partial anterior cruciate ligament ("ACL") tear, on August 17, 2006. (R. at 1153.) Plaintiff underwent physical therapy. (R. at 1097-1141.) Her pain persisted, however, and Dr. King concluded that her "chronic musculoskeletal discomfort . . . continued to limit her ability to perform various activities of daily living" and diagnosed Plaintiff as suffering from chronic myofascial pain syndrome. (R. at 1169-70.)

On January 17, 2007, Dr. Raisis injected Plaintiff's knee with Depo Medrol and Marcaine. (R. at 1146.) As of February 5, 2007, Dr. Rasis noted that Plaintiff had a good response to the injection and "had reached maximum medical improvement." (R. at 1146.) Plaintiff's complaints regarding knee pain persisted, however. At a December 10, 2007 visit, Dr. Raisis suspected that Plaintiff was developing degenerative arthritis in her right

7

knee.  (R. at 1305.)  She was evaluated again for knee pain by

Evan H. Crain, M.D. on January 17, 2008.  (R. at 1299.)  Dr.

Crain recommended physical therapy and exercise.  (R. at 1299.)

Plaintiff's complaints of neck and back pain also persisted.

(R. at 1165-66.)  In an April 2, 2007 letter to Plaintiff's

counsel, Dr. King reported:

> Regarding the injury to her thoracic spine, the prognosis is
> good.  The prognosis regarding the injuries to the neck and
> low back is less favorable.  The patient has continued to
> experience ongoing neck and low back pain exacerbated by
> various activities of daily living.  Moreover, her
> subjective complaints of neck and low back pain clinically
> correlate with ongoing objective evidence on physical
> examination of residual myospasm involving the trapezius and
> lumbar paraspinal muscles.  Due to the nature and severity
> of her neck and low back injuries and the chronicity of her
> symptoms and signs, it is my opinion within a reasonable
> degree of medical probability that the injuries to the neck
> and low back, causally related to the motor vehicle accident
> which occurred on 2/9/06, are permanent.  The prognosis
> regarding these injuries remains guarded.

(R. at 1162.)

b.   Other Medical Issues

In addition to her hip, back and knee issues, Plaintiff

received treatment for additional medical problems.  Plaintiff

had multiple surgeries to remove ovarian cysts and underwent a

total hysterectomy.  (R. at 773-94; 832-41; 923-23; 1215.)

Plaintiff also had a history of kidney stones.  She underwent

renal lithrotripsy to remove the stones.  (R. at 1213.)

The record reflects that Plaintiff also saw a variety of

other specialists.  A gastroenterologist suspected that Plaintiff

8

suffered from irritable bowel syndrome based on a 2006 exam. (R. at 1206.) A vascular specialist concluded that Plaintiff suffered no issues caused by a laceration of her right wrist. (R. at 1210.) In January 2007, Plaintiff was diagnosed as suffering "moderate bunion deformity bilateral" and "accessory bone at the interpalangeal joint of both great toes." (R. at 1226-27.) She underwent corrective surgery the following April. (R. at 1228-29.) Records from David Krasner, D.O., Plaintiff's general physician, show that Plaintiff received treatment for tobacco use, ingrown toenail, insomnia and hypertension. (R. at 1259.) A heart murmur was observed in a treatment note made in connection with Plaintiff's surgery to remove ovarian cysts. (R. at 928.) In March 2008, Dr. Krasner noted that Plaintiff presented "normal heart sounds, regular rate and rhythm with no murmurs." (R. at 1322.)

c.   Mental Impairments

In November 2006, Plaintiff reported anxiety and depression to Dr. Krasner, who referred Plaintiff to Patricia Lifrak, M.D. (R. at 1242-52; 1283-87.) Dr. Lifrak diagnosed Plaintiff as suffering bipolar disorder, not otherwise specified, and prescribed Plaintiff medication and therapy. (R. at 1242-52.) Plaintiff received psychological counseling from Gloria Crespo, Psy.D., who likewise noted that Plaintiff suffered from depression, difficulty sleeping and anxiety. (R. at 1253-58.)

9

Plaintiff continued to see Dr. Crespo periodically throughout 2007 and 2008. (R. at 1254-58; 1313-14.)

### d.  Functional Capacity Assessments

The record reflects eight different residual functional capacity ("RFC") assessments for Plaintiff.

#### i.  Irwin Lifrak, M.D.

On October 18, 2005, Dr. Lifrak, a state examiner, observed that Plaintiff's "[r]ange of motion was reduced in the area of the lumbosacral spine at the right hip." (R. at 944.) He concluded that Plaintiff experienced "persistent pain and decreased mobility of the right hip" and "[d]egenerative joint disease and possible disc damage." (R. at 945.) Based on his examination, Dr. Lifrak concluded that, during the course of a typical, eight-hour workday, Plaintiff could walk either indoors or outdoors, climb stairs on a limited basis, sit for a total of five or six hours, stand for four and regularly lift ten pounds with either hand. (R. at 945.)

#### ii.  Robert Palandjian, D.O.

Dr. Palandjian, a non-examining state physician, reviewed Plaintiff's medical records and completed an RFC assessment on November 29, 2005. (R. at 948-56.) Based on this review, he concluded that Plaintiff could stand or walk for two hours a day and sit for six hours. (R. at 949.) He further found that Plaintiff could occasionally lift twenty pounds and frequently

10

lift ten pounds. (R. at 949.)  Dr. Palandjian concluded that
Plaintiff's ability to push or pull was limited, that she could
frequently stoop or crouch and occasionally climb stairs,
balance, kneel or crawl.  (R. at 949-50.)  He noted Dr. Rasis's
assessment that Plaintiff could perform only sedentary[4] work but
nonetheless concluded that Plaintiff could perform light work.[5]
(R. at 956.)

---

[4]    Sedentary work:

involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files,
ledgers, and small tools.  Although a sedentary job is
defined as one which involves sitting, a certain amount of
walking or standing is often necessary in carrying out job
duties.  Jobs are sedentary if walking and standing are
required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  A sedentary job limits standing or
walking to two hours out of an eight-hour workday and sitting to
six hours. See Mason v. Shalala, 994 F.2d 1058, 1061 n.4 (3d Cir.
1993) (citing Social Security Administration, Social Security
Ruling No. 83-10. (1983)).

[5]    Light work

involves lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10
pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of
walking or standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg controls.
To be considered capable of performing a full or wide range
of light work, you must have the ability to do substantially
all of these activities.  If someone can do light work, we
determine that he or she can also do sedentary work, unless
there are additional limiting factors such as loss of fine
dexterity or inability to sit for a long period of time.

20 C.F.R. § 404.1567(b).

### iii.    Frederick Kurz, Ph.D.

On June 14, 2006, Dr. Kurz performed a clinical psychological evaluation of Plaintiff.  (R. at 1056-60.)  He noted that her responses to the Burns Depression Checklist "indicated that she ha[d] been experiencing significant levels of depression over the last couple weeks."  (R. at 1056.)  Dr. Kurz concluded that Plaintiff "appear[ed] to function within average levels of intelligence" but had difficulty with short term memory and attention skills, "possibly related to sleep deprivation, pain and depression."  (R. at 1058.)  He diagnosed Plaintiff as suffering from major depressive disorder, which caused Plaintiff moderately severe impairment with regard to her ability to carry out instructions, sustain work performance and attendance and cope with ordinary work pressures.  (R. at 1060.)

### iv.    Yong Kim, M.D.

Plaintiff was seen by a second state physical examiner, Dr. Kim, on June 21, 2006. (R. at 1061-65.)  Dr. Kim found Plaintiff to suffer residual pain from her right hip replacement and "mild to moderate tenderness . . . from [the] lumbosacral junction, (R) sacroiliac area, and (R) gluteal area."  (R. at 1062-63.)  He concluded that Plaintiff could stand or sit for four to six hours in a work day and lift ten to twenty pounds.  (R. at 1063.)

### v.    Pedro Ferreira, D.O.

12

On July 18, 2006, Dr. Ferreira reviewed Plaintiff's records
and completed a mental RFC. (R. at 1071-81.)  He concluded that
Plaintiff suffered moderate limitation in her ability to maintain
social function and concentration but only mild restriction on
her daily activities. (R. at 1079.)  He found Plaintiff's
ability to understand detailed instructions and complete a normal
work day or week without interruption from psychological symptoms
was moderately limited. (R. at 1082-83.)  Dr. Ferreira concluded
that Plaintiff appeared "capable of simple, repetitive work."
(R. at 1084.)

vi.   Dr. Cary

Dr. Cary, Plaintiff's pain management specialist, completed
a RFC-type form at the request of Plaintiff's attorney on
December 6, 2007. (R. at 1301.)  He reported that Plaintiff
could not lift or carry any amount of weight and could only sit,
stand or walk for thirty minutes at a time, for a total of one
and half hours a workday. (R. at 1301.)  Dr. Cary reported that
Plaintiff would need to lie down or elevate her legs for thirty
minutes to an hour and take eight, unscheduled breaks for
approximately ten to fifteen minutes each. (Id.)  He noted that
Plaintiff suffered severe pain and could never twist, stoop,
crouch, climb, reach, handle, push or pull during the workday.
(R. at 1302.)  He further concluded that Plaintiff would miss
twenty to twenty-five days a month as a result of her pain.

13

(Id.)  Dr. Cary opined that Plaintiff could not perform sedentary work.  (Id.)

      vii.  Dr. Crespo

   Dr. Crespo, Plaintiff's psychologist, completed a mental RFC for Plaintiff on December 18, 2007.  (R. at 1193-97.)  She opined that Plaintiff's mental ability to perform unskilled or semiskilled work was generally poor or seriously limited.  (R. at 1195-96.)  She noted that Plaintiff "[wa]s currently in a depressed state [with] significant anxiety [and] [wa]s currently unable to perform work duties of any kind."  (R. at 1195.)  Dr. Crespo concluded that Plaintiff's condition caused marked difficulty in concentration, moderate difficulty in maintaining social function and moderate restriction on Plaintiff's daily activities.  (R. at 1197.)  He opined that Plaintiff's condition, or its treatment, would cause her more than four absences a month.  (R. at 1197.)

      viii.  Dr. Krasner

   Plaintiff's general physician, Dr. Krasner, also provided a RFC assessment on December 18, 2007.  (R. at 1199-1201.)  He concluded that Plaintiff could not lift or carry any amount of weight and could stand or walk for a total of one hour and sit for a total of three to four hours during a normal work day.  (R. at 1199.)  Dr. Krasner noted that Plaintiff "needs to be able to lay down almost every hour" and that she suffered severe pain.

14

(Id.)  He estimated that Plaintiff's pain would cause her to miss
at least an hour each day and a total of fifteen days a month.
(R. at 1200.)  Dr. Krasner reported that Plaintiff should never
twist, stoop, crouch, climb, push or pull during a normal workday
due to "her severe injury to right knee and persistent pain in
right hip."  (Id.)  He concluded that Plaintiff was incapable of
performing sedentary work "due to her need to lay down
frequently, her limited ability to stand or sit on a prolonged
basis and due to her emotional instability."  (R. at 1201.)

    e.   The Hearings

    The ALJ conducted two hearings, one on December 5, 2007 and
a supplemental hearing on March 24, 2008.  Plaintiff and Ellen
Jenkins, a vocational expert, testified at both hearings.  With
regard to her residual functional capacity, Plaintiff testified
that she could stand for approximately one hour but sit for less
than one hour at a time.  (R. at 1367.)  She explained that she
could only lift five or ten pounds because of problems in her
neck and shoulders.  (Id.)  Plaintiff also described needing to
lie down frequently throughout the day.  (R. at 1376-77.)

    Ms. Jenkins, the vocational expert, testified that a person
with Plaintiff's underlying impairments could not return to
Plaintiff's past relevant work as a school bus driver.  (R. at
1385.)  She noted, however, that simple, unskilled work would be
available to a person with such impairments and identified three

positions at the light exertional level that would be available in the national and regional economy:  non-postal mail sorter, library clerk or cashier.  (R. at 1385-86.)  She likewise identified three available positions at the sedentary exertional level:  film cutter, security monitor and packer.  (R. at 1386.) Notably, when asked to consider the limitations described in Dr. Crespo's mental impairment questionnaire, Ms. Jenkins concluded that the identified positions would not be available.  (R. at 1387.)  She also noted that the limitations described in Dr. Kurz's RFC would prevent a person from performing the jobs identified.  (R. at 1388.)

At the March 24, 2008, Plaintiff relayed experiencing a nervous breakdown and described suicidal ideation.  (R. at 1418-21.)  She testified that although she sought treatment at a local hospital, she did not tell doctors about the episode because she did not want to be hospitalized.  (R. at 1419-21.)  Treatment notes regarding this incident do not appear to be part of the record.

Ms. Jenkins also testified.  She considered a hypothetical person with Plaintiff's impairments as identified by Dr. Krasner and Dr. Cary.  (R. at 1424-26.)  She concluded that such individuals would not be capable of employment.  (Id.)

## II.  Discussion

### A.  Standard of Review

16

When reviewing a final decision of the Social Security Commissioner, the Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C.§§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  "Substantial evidence" means "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  Where the ALJ's findings of fact are supported by such evidence, the Court is bound by the Commissioner's findings, "even if [it] would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)(citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)).  Thus, this Court must "review the evidence in its totality, but where it is susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld."  Ahearn v. Comm'r of Soc. Sec., 165 Fed. Appx. 212, 215 (3d Cir. 2006)(citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

The Commissioner, however, "must adequately explain in the record his reason for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F.Supp. 273, 278 (M.D. Pa. 1987)

17

(citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  Said
differently,

> [u]nless the [Commissioner] has analyzed al evidence and has
> sufficiently explained the weight he has given to obviously
> probative exhibits, to say that his decision is supported by
> substantial evidence approaches an abdication of the Court's
> duty to scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)(quoting

Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th

Cir. 1977)); see also Guerrero v. Comm'r of Soc. Sec., Civ. No.

05-1709, 2006 WL 1722356, at *3 (D.N.J. June 19, 2006)(stating

that it is the ALJ's responsibility "to analyze all the evidence

and to provide adequate explanations when disregarding portions

of it"), aff'd, 249 Fed. Appx. 289 (3d Cir. 2007).

     While the ALJ must review and consider pertinent medical

evidence, review all non-medical evidence and "explain [any]

conciliations or rejections," Burnett v. Comm'r of Soc. Sec., 220

F.3d 112, 122 (3d Cir. 2000), "[t]here is no requirement that the

ALJ discuss in [his] opinion every tidbit of evidence included in

the record." Hur v. Barnhart, 94 Fed. Appx. 130, 133 (3d Cir,

2004) see also Fargnoli, 247 F.3d at 42 ("[a]lthough we do not

expect the ALJ to make reference to every relevant treatment note

in a case where the claimant . . . has voluminous medical

records, we do expect the ALJ, as the factfinder, to consider and

evaluate the medical evidence in the record consistent with his

responsibilities under the regulations and case law."). Overall,

the Court must set aside the Commissioner's decision if the
Commissioner did not take the entire record into account or
failed to resolve an evidentiary conflict.  Schonewolf v.
Callahan, 972 F.Supp. 277, 284-85 (D.N.J. 1997) (quoting Gober,
574 F.2d at 776).

In addition to the substantial evidence inquiry, this Court
must also review whether the administrative determination was
made upon application of the correct legal standards.  Sykes v.
Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedbeg v. Schweiker,
721 F.2d 445, 447 (3d Cir. 1983).  The Court's review of legal
issues is plenary.  Sykes, 228 F.3d at 262; Schaudeck v. Comm'r
of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).

B.   Disability Defined

The Social Security Act defines disability as the inability
"to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than twelve
months."  42 U.S.C. § 1382c(a)(3)(A).  The Act further states,

> [A]n individual shall be determined to be under a disability
> only if his physical or mental impairment or impairments are
> of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he applied for
> work.

19

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).  In Plummer, 186 F.3d at 427-28, the Third Circuit set out the Commissioner's inquiry at each step of this analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  See 20 C.F.R. § 404.1523.  The ALJ will often

seek the assistance of a vocational expert at this fifth step.  See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

This same five-step analysis applies when a Plaintiff makes a claim based on mental impairments.  See 20 C.F.R. § 404.1520a. However, the Commissioner applies a "special technique" at each step of the analysis.  Id.  The Third Circuit summarized this technique in Morales v. Apfel, 225 F.3d 310, 316 n.7 (3d Cir. 2000):

> The regulations dealing specifically with mental impairments further require the Commissioner to record the pertinent symptoms and effect of treatment to determine if an impairment exists.  See 20 C.F.R. § 404.1520a(b)(1) (1999). If an impairment is found, the Commissioner must analyze whether certain medical findings relevant to the claimant's ability to work are present or absent.  See 20 C.F.R. § 404.1520a(b)(2).  The Commissioner must then rate the degree of functional loss in certain areas deemed for work including daily living, social functioning, concentration, persistence or pace, and deterioration in work-like settings.  See 20 C.F.R. § 404.1520a(b)(3). If the mental impairment is considered "severe," the Commissioner must determine if it meets a listed mental disorder. If it is severe but does not equal a listed disorder, the Commissioner must conduct a residual functional capacity assessment.  See 20 C.F.R. § 404.1520a(c)(3).  At each level of administrative adjudication, a Psychiatric Review Treatment Form must be completed.  See 20 C.F.R. § 404.1520a(d).

C.   Analysis

Plaintiff argues that the ALJ's consideration of the medical opinion evidence in the record violated her duty under the regulations and existing case law.  Specifically, she argues that the ALJ erred in failing to assign the medical opinions of

Plaintiff's treating physicians significant, if not controlling, weight.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales, 225 F.3d at 317 (quoting Plummer, 186. F.3d at 429).  Indeed, the regulations instruct:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2).

Where an ALJ determines that a treating physician's assessment is not entitled to controlling weight, he or she must make findings with respect to the following factors:  length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, as well as the supportability, consistency, specialization and other factors "which tend to support or contradict the opinion."  20 C.F.R. §

22

404.1527(d)(2)-(6).  Thus, "[w]here a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'"  Fargnoli, 247 F.3d at 43 (quoting 20 C.F.R. § 404.1527(d)(2)).

"Where a treating physician's medical opinion conflicts with a non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Morales, 225 F.3d at 317 (quoting Plummer, 186 F.3d at 429).  The ALJ "may reject 'a treating physician's opinion outright only on the basis of contradictory evidence in the record' and not due to his or her own credibility judgments, speculation or lay opinion." Morales, 225 F.3d at 318.

Here, the ALJ concluded that "[t]he opinions of the treating physicians in this case were not supported by sufficient objective evidence." (R. at 31.)  First, the Court notes that the ALJ's failure to address the factors laid out in 20 C.F.R. § 404.1527(d)(2)-(6), which are to be applied by the ALJ upon his or her determination that a treating physician's assessment is not entitled to controlling weight, was error.  Second, the Court is mindful that the ALJ did not clearly identify what evidence, if any, she considered to be conflicting with the treating

23

physicians' opinions.   Finally, any contention that the treating physician's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques cannot seriously be maintained.   The record is replete with diagnostic studies detailing problems with Plaintiff's knee, hip and spine.[6] Thus, it appears from this record that the medical opinions of Plaintiff's treating physicians were entitled to deference from the ALJ.

    As for the ALJ's rejection of Plaintiff's treating psychologist's opinion, again, the ALJ failed to make clear findings supporting her credibility determination.   The ALJ noted that Dr. Crespo's Global Assessment Functioning ("GAF") score was inconsistent with the assessments of Dr. Kurz and Dr. Lifrak. (R. at 27.)   But the ALJ needed to do more than simply identify a difference in opinion as the basis for discrediting Dr. Crespo's account; she was required to weigh the credibility of such competing evidence and state clearly her reasons for adopting or discounting it.   See Fargnoli, 247 F.3d at 43 (citing Burnett, 220 F.3d at 121; Cotter v. Harris, 642 F.2d 700, 705. (3d Cir. 1981)) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he

---

[6]     In his RFC assessment, Dr. Krasner attributed Plaintiff's impairments to the torn ligament in her right knee and persistent pain in her hip.  (R. at 1199-1200.)  Dr. Cary identified Plaintiff's spine condition as providing the basis for his RFC assessment.  (R. at 1301.)

rejects and his reason(s) for discounting that evidence."). Thus, the bare fact that Dr. Crespo reached a different conclusion than Dr. Kurz and Dr. Lifrak, or with any other examiner for that matter, without further explanation, does not suffice to discredit Dr. Crespo's opinion.

The ALJ also identified what she considered to be inconsistencies in Dr. Crespo's psychological assessment of Plaintiff, i.e., Dr. Crespo's conclusion that Plaintiff was "currently" incapable of performing work duties but found that Plaintiff's condition caused only moderate restriction of daily living activities and moderate difficulty in maintaining social function. (R. at 27.) The ALJ likewise considered Dr. Crespo's evaluation of Plaintiff's capacity for work as contradicted by Dr. Crespo's examination narrative and functional limitation assessment. The ALJ's assessment of such supposed internal inconsistencies, however, constituted an impermissible credibility determination given that it appears to have been based on the ALJ's own speculation or lay opinion and not record evidence.

Even more troubling is the fact that the ALJ failed to consider that the opinion of the state's consultative examiner could support a determination of disability. The ALJ concluded, without acknowledging the findings of Dr. Kurz, that the

Plaintiff's mental impairment did not cause "at least <u>two</u> 'marked' limitations." (R. at 28 (emphasis added).)  By contrast, Dr. Kurz opined that Plaintiff exhibited moderately severe impairment with regard to her ability to relate to people, her daily activities and constriction of interests.  A "moderately severe" impairment falls within the definition of "marked."  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme.).

In sum, this Court cannot fulfill its duty of review absent sufficient explanation of the ALJ's credibility determinations with regard to the medical opinions in the record.  The Court must therefore remand this matter to permit the ALJ to either credit the opinions of Plaintiff's treating physicians or provide an adequate explanation for rejecting these opinions.

Given the Court's decision to remand this matter, it need only touch on Plaintiff's other arguments.  Plaintiff argues that the vocational expert's identification of the positions of film developer/cutter, packer and security monitor as unskilled and sedentary was inconsistent with the Dictionary of Occupational Titles (4th ed. 1991) ("DOT").  <u>See</u> R. at 1386-87.  In <u>Burns v. Barnhart</u>, 312 F.3d 113, 127 (3d Cir. 2002), the Third Circuit suggested an appropriate remedy for this problem:

> Social Security Ruling 00-4p requires that the ALJ ask the
> vocational expert whether any possible conflict exists

> between the vocational expert's testimony and the DOT, and
> that, if the testimony does appear to conflict with the DOT,
> to "elicit a reasonable explanation for the apparent
> conflict."  The Ruling requires that the explanation be made
> on the record and that the ALJ explain in his decision how
> the conflict was resolved.  Thus, on remand, the conflicts
> that persist, if any, should be treated accordingly.

On remand, any conflict between the vocational expert's testimony
and the DOT should be resolved in a like manner.

Finally, the Court declines Plaintiff's invitation to direct
an award of benefits in her favor.  This is not a case where
undisputed evidence supports an award of benefits.  The record
reflects conflicting opinions regarding Plaintiff's ability to
perform sedentary or light work.  Thus, although noting the
lengthy record that has developed in this case, the Court will
remand this matter to the ALJ for further consideration
consistent with this opinion.

## III. Conclusion

For the reasons discussed above, the Court finds that the
ALJ failed to assign significant weight to the medical opinions
of Plaintiff's treating physicians.  The decision below is
vacated, and this case is remanded to the ALJ for further
consideration consistent with this opinion.  An accompanying
Order will issue this date.


Dated: December 29, 2010          s/Renée Marie Bumb
                                  RENÉE MARIE BUMB
                                  UNITED STATES DISTRICT JUDGE